## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: ACTOS PRODUCTS LIABILITY LITIGATION | ) MDL No. 6:11-md-2299 |
| | ) |
| | ) JUDGE DOHERTY |
| ------------------------------------------------------- | ) |
| THE CHEROKEE NATION, Individually and on behalf of all others similarly situated, | ) MAGISTRATE JUDGE HANNA |
| | ) |
| | ) Civil Action No.: _____ |
| Plaintiffs, | ) |
| | ) |
| v. | ) CLASS ACTION COMPLAINT |
| | ) |
| TAKEDA PHARMACEUTICALS USA, INC.(fka TAKEDA PHARMACEUTICAL NORTH AMERICA, INC.), TAKEDA DEVELOPMENT CENTER AMERICAS, INC. (fka TAKEDA GLOBAL RESEARCH & DEVELOPMENT CENTER, Inc.), TAKEDA PHARMACEUTICALS AMERICA, INC,.TAKEDA CALIFORNIA, INC. (fka TAKEDA SAN DIEGO, INC.), TAKEDA PHARMACEUTICALS INTERNATIONAL, INC., TAKEDA PHARMACEUTICAL COMPANY LIMITED, and ELI LILLY & COMPANY, | ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

Plaintiff, the Cherokee Nation, on behalf of itself and a class of similarly situated Indian tribes and their respective health services providers (the "Putative Class"), bring this class action against Defendants Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Development Center Americas, Inc., Takeda Pharmaceuticals International, Inc., Takeda California, Inc., and Takeda Pharmaceuticals, L.L.C. (collectively "TAKEDA") and Eli Lilly & Company ("Lilly") for the marketing and sale of Actos® (pioglitazone Hcl) ("Actos"). The Cherokee Nation files this Complaint upon knowledge as to facts pertaining to itself and upon information and belief as to other matters as follows:

1

**NATURE OF THE ACTION**

1.      The Cherokee Nation is a federally recognized Indian tribe operating the largest tribally run health care system in the United States.

2.      This action seeks to recover damages for injuries caused as the direct and proximate result of the wrongful conduct of the Defendants in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the widely used diabetes prescription drug Actos (pioglitazone ), prescription medication used to improve blood sugar (glucose) control in adults with Type II diabetes. Actos is sold as a single ingredient product under the brand name Actos.

3.      The Putative Class seeks to enforce the rights of Indian tribes as follows:

a.      To determine whether the Federal Medical Care Recovery Act ("FMCRA") requires TAKEDA to address the Indian tribes' subrogation interests regarding the tribal members who received treatment for Actos related injuries (hereinafter "Settling Actos Claimants;"

b.      To require TAKEDA to address Indian tribes' subrogation rights prior to dispersing settlement proceeds;

c.      To determine the reasonable cost of medical care for each qualifying Actos related injury paid by Indian tribes to Settling Actos Claimants;

d.      To reimburse the reasonable cost of medical care provided by Indian tribes for Actos related injuries;

e.      Damages for TAKEDA's failure to pay such reimbursements including interest and attorneys' fee;

f.      Injunctive relief to stop payments to Settling Actos Claimants that received medical treatment for Actos related injuries.

4.      The purpose of applying the FMCRA to Indian tribes is to provide tribes a way to recover from tortfeasors whose wrongful acts created the need for Indian tribes to provide medical care to their members.

5.      Under the FMCRA, tortfeasors are no longer able to escape financial responsibility for the consequences of their wrongful acts and Indian tribes can recover for medical care necessitated by those acts.  Additionally, injured parties who were able to recover for the value of their medical services provided to them are no longer be able to keep that windfall award.  Allowing Takeda to avoid its reimbursement obligations will cause Settling Actos Claimants that received medical care from Indian tribes to receive such a windfall.

6.      As a result of TAKEDA's conduct, it is liable to the Plaintiff and Putative Class members for damages equal to the reasonable cost of medical care to treat the qualifying injuries of Actos Claimants and the costs of prescriptions.

7.      Plaintiff also seeks equitable relief compelling TAKEDA to identify Actos Settling Actos Claimants, their injuries, attorneys, and the respective tribal health care providers.

**PARTIES**

8.      The Cherokee Nation is a federally recognized Indian tribe operating the largest tribally run health care system in the United States.  The Cherokee Nation brings this action as a purchaser, distributor, and medical provider for Actos and Actos related injuries, as a representative of individual tribal members, and pursuant to *parens patriae*.  The Cherokee Nation has purchased approximately $30,000,000.00 (thirty million dollars) of Actos and paid millions more on treating Actos related injuries.

3

9.     Upon information and belief, Defendant, TAKEDA PHARMACEUTICALS U.S.A. INC., (f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.) is a Delaware corporation, having a principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.  As part of its business, TAKEDA PHARMACEUTICALS U.S.A. INC. is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

10.    Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, is a Japanese corporation having a principal place of business at 1-1, Doshomachi 4-chome, Chuoku, Osaka, Japan. As part of its business, TAKEDA PHARMACEUTICAL COMPANY LIMITED is involved in the research, development, sales, and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

11.    Defendant, TAKEDA PHARMACEUTICALS AMERICA, INC., is a Delaware limited liability company, having a principal place of business at One Takeda Parkway, Deerfield, Illinois 60015. As part of its business, TAKEDA PHARMACEUTICALS AMERICA, INC. is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

12.    Defendant, TAKEDA PHARMACEUTICALS INTERNATIONAL INC., is an Illinois corporation, having a principal place of business at One Takeda Parkway, Deerfield, IL 60015. As part of its business TAKEDA PHARMACEUTICALS INTERNATIONAL INC. is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

13.    Defendant, TAKEDA DEVELOPMENT CENTER AMERICAS, INC. (f/k/a TAKEDA GLOBAL RESEARCH & DEVELOPMENT CENTER INC.), is an Illinois

corporation, having a principal place of business at One Takeda Parkway, Deerfield, IL 60015. As part of its business TAKEDA DEVELOPMENT CENTER AMERICAS, INC. is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

14.     Defendant, TAKEDA CALIFORNIA INC., (f/k/a TAKEDA SAN DIEGO INC.) is a California corporation, having a principal place of business at 10410 Science Center Drive, San Diego, CA 92121. As part of its business TAKEDA CALIFORNIA INC. is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

15.     Defendant ELI LILLY AND COMPANY is an Indiana corporation, having a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. As part of its business ELI LILLY AND COMPANY is involved in the research, development, sales and marketing of pharmaceutical products including Actos and pioglitazone hydrochloride.

16.     Upon information and belief, at relevant times, Defendants were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, either directly or indirectly through third parties or related entities, its products, including Actos and pioglitazone hydrochloride.

17.     At relevant times, Defendants conducted regular and sustained business and engaged in substantial commerce and business activity into the Cherokee Nation and in the States of Oklahoma, Arkansas, and Missouri, which included but was not limited to selling, marketing and distributing its products including Actos and pioglitazone hydrochloride into the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri.

18.     Upon information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America including the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, and Defendants derived and derive substantial revenue from interstate commerce.

19.     Upon information and belief, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, is a company domiciled in Japan and is the parent/holding company of Defendants, TAKEDA PHARMACEUTICALS INTERNATIONAL INC., TAKEDA PHARMACEUTICALS U.S.A. INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TAKEDA DEVELOPMENT CENTER AMERICAS, INC., and TAKEDA CALIFORNIA INC.

20.     Upon information and belief, at all relevant times, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, exercised and exercises dominion and control over Defendants, TAKEDA PHARMACEUTICALS INTERNATIONAL INC., TAKEDA PHARMACEUTICALS U.S.A. INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TAKEDA DEVELOPMENT CENTER AMERICAS, INC., and TAKEDA CALIFORNIA INC..

21.     Upon information and belief, at all relevant times, Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, expected or should have expected that its acts would have consequences within the United States of America and into the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, derived and derive substantial revenue from interstate commerce.

22.     Upon information and belief, at all relevant times, Defendants, including Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, have transacted and conducted business in the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, and/or contracted to supply goods and services within the Cherokee Nation and the States of

Oklahoma, Arkansas, and Missouri, and these causes of action have arisen from same.

23.     Upon information and belief, at all relevant times, Defendants, including Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, committed a tortious act within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, causing injury within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, out of which act(s) these causes of action arise.

24.     Upon information and belief, at all relevant times, Defendants, including Defendant, TAKEDA PHARMACEUTICAL COMPANY LIMITED, committed tortious act(s) within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, out of which act(s) these causes of action arise.

25.     Upon information and belief, at all relevant times, Defendant ELI LILLY AND COMPANY expected or should have expected that its acts would have consequences within the United States of America and the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, derived and derive substantial revenue from interstate commerce.

26.     Upon information and belief, at all relevant times, Defendants, including Defendant ELI LILLY AND COMPANY have transacted and conducted business in the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, and/or contracted to supply goods and services within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, and these causes of action have arisen from same.

27.     Upon information and belief, at all relevant times, Defendants, including Defendant ELI LILLY AND COMPANY committed a tortious act within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, causing injury within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, out of which act(s) these causes of action

arise.

28.     Upon information and belief, at all relevant times, Defendants, including Defendant ELI LILLY AND COMPANY committed tortious act(s) within the Cherokee Nation and the States of Oklahoma, Arkansas, and Missouri, out of which act(s) these causes of action arise.

**JURISDICTION AND VENUE**

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The Putative Class members' claims arise under federal law and seek in excess of $75,000.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because TAKEDA does business in this District, and a substantial part of the Actos litigation, takes place in this District.  *See* Second Amended CMO 2, §II.

**FACTUAL ALLEGATIONS**

31.     American Indians have the highest rates of Type II diabetes in the United States. Once exclusively a disease of adults, Type II diabetes is increasingly common among youth, threatening the health, well-being, and quality of life of future Indian generations. Diabetes is an epidemic in the Indian country.

32.     Type 2 diabetes mellitus is a metabolic disorder.  Patients with this disorder become resistant to the insulin produced by their own pancreas.

33.     Defendants, directly or through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted and sold Actos, for the treatment of type II diabetes mellitus.

34.     According to the American Diabetes Association, Type II diabetes is the most common form of diabetes. Type II diabetes develops when the body does not produce enough

insulin or doesn't efficiently use the insulin that it does produce. Type I diabetes occurs when the body does not produce any insulin at all. Insulin is necessary for the body to be able to use glucose for energy.

35.     Beginning in the 1990's, pharmaceutical companies developed, manufactured, and produced drugs known as thiazolidinediones ("TZDs" or "glitizones") for the treatment of type II diabetes ("DM").

36.     Actos was approved by the Food and Drug Administration ("FDA") in July of 1999 to treat type II diabetes. Actos is in a class of insulin-sensitizing diabetes agents known as thiazolidinediones ("TZD's"). TAKEDA manufactures and markets the TZD medication pioglitazone under the trade name "Actos." Actos was jointly launched by Takeda North America and Lilly in 1999.

37.     On April 20, 2006, Takeda Limited announced the conclusion of its collaboration in the United States between Takeda North America and Lilly to promote and market Actos, a partnership Takeda Limited described as "a great success" and "mutually beneficial to both companies."

38.     Actos exerts its antihyperglycemic effect only in the presence of endogenous insulin. Therefore, Actos is only used to treat type II diabetes and should not be used to treat type I diabetes.

39.     Actos is sold as a single ingredient product under the brand name Actos, and it is also sold in combination with metformin (Actoplus Met, Actoplus Met XR) and in combination with glimepiride (Duetact).

40.     As a result of the defective nature of Actos, persons who were prescribed and ingested Actos for more than twelve (12) months, including Plaintiff's members, have suffered and may continue to suffer from bladder cancer.

41.     Defendants concealed and continue to conceal their knowledge that Actos can cause bladder cancer from Plaintiffs' insured, other consumers, and the medical community. Specifically, Defendants have yet to adequately inform consumers and the prescribing medical community about the risks of bladder cancer with the use of ACTOS for more than twelve (12) months.

42.     As a result of Defendants' actions and inactions, Plaintiff's members were injured due to ingestion of Actos, which caused and will continue to cause Plaintiff's members various injuries and damages. Plaintiffs accordingly seek damages incurred by them that are associated with these injuries.

43.     Prior to Actos being approved by the FDA, a two-year carcinogenicity study was conducted on male and female rats. Drug-induced tumors were observed in male rats receiving doses of Actos that produced blood drug levels equivalent to those resulting from a clinical does.

44.     In 2005, the results of the PROactive (**PRO**spective Pioglit**A**zone **C**linical **T**rial **I**n Macro **V**ascular **E**vents) three-year study were published. PROactive prospectively looked at the impact in total mortality and macrovascular morbidity using Actos. Dormandy J.A., et al., *Secondary Prevention of Macrovascular Events in Patients with Type 2 Diabetes in the PROactive Study (PROspective PioglitAzone Clinical Trial In Macro Vascular Events): a Randomized Controlled Trial,* Lancet, 266:1279-1289 (2005).

45.     The PROactive study was looking at cardiovascular events and outcomes. However, the study demonstrated a higher percentage of bladder cancer cases in patients

10

receiving Actos versus comparators. This information was not included in the published Dormandy paper.

46.     A thee-year liver safety study was also performed, and according to the FDA, that study also demonstrated a higher percentage of bladder cancer cases in patients receiving Actos versus comparators.

47.     On September 17, 2010, the FDA issued a Safety Announcement stating it was undertaking a review of the data from an ongoing, ten-year epidemiological study being conducted by Kaiser Permanente to evaluate the association between Actos and bladder cancer. The planned five-year interim analysis demonstrated that the risk of bladder cancer increases with increasing dose and duration of Actos use, reaching statistical significance after 24 months.

48.     Despite this finding by the FDA, Robert Spanheimer, Vice President of Medical and Scientific Affairs for Takeda, claimed to Reuters that the Kaiser Permanente study has not shown a risk to patients of bladder cancer or other cancers from Actos.

49.     In early 2011, the American Diabetes Association published *Assessing the Association of Pioglitazone Use and Bladder Cancer Through Drug Adverse Event Reporting*, Piccinni, et al. Diabetes Care 34:1369-1371 (June 2011), published ahead of print April 22, 2011. This study looked at adverse events reports made to the FDA between 2004 and 2009.

50.     The conclusion of that study was that "[i]n agreement with preclinical and clinical studies, AERS analysis is consistent with association between pioglitazone and bladder cancer. This issue needs constant epidemiologic surveillance and urgent definition by more specific studies."

51.     On June 9, 2011, the European Medicines Agent ("EMA) announced that is had been informed by the French Medicines Agency ("Afssaps") of its decision to suspend the use of

pioglitazone-containing medicines (Actos, Competact) in France while awaiting the outcome of the ongoing European review.

52.     France's decision was based upon a retrospective cohort study in France using the French National Health Insurance Plan which demonstrated a statistically significant increase in the risk for bladder cancer in males exposed to Actos for more than a year. The French cohort included 1.5 million patients with diabetes that were followed for 4 years (2006-2009).

53.     On June 10, 2011, Reuters published that Germany had joined France in suspending the use of Actos after Germany's Federal Institute for Drugs and Medical Devises ("BfArM") reviewed the results of the French study. BfArM recommended that doctors should not put new patients on pioglitazone.

54.     June 15, 2011, the FDA issued another Safety Announcement stating that "use of the diabetes medication Actos (pioglitazone) for more than one year may be associated with an increased risk of bladder cancer." The FDA ordered information about this risk to be added to the Warnings and Precautions section of the label for pioglitazone-containing medicines.

55.     The FDA reported that the risk of bladder cancer increased with increasing dose and duration of pioglitazone use. When compared to persons never exposed to pioglitazone, exposed to pioglitazone therapy for longer than 12 months was associated with a 40% increase in risk.  Based on this data, the FDA calculated that therapy with ACTOS for longer than 12 months was associated with 27.5 excess cases of bladder cancer per 100,000 person-years follow-up, compared to those who never used pioglitazone.

56.     On July 12, 2011, Takeda Limited issued a recall on Actos in France.

57.     As the manufacturers of Actos, Defendants knew or should have known that Actos use for longer than 12 months was associated with bladder cancer. Instead, Defendants promoted Actos as a safe and effective treatment for type II diabetes.

58.     Piccinni, et al. analyzed the association between antidiabetic drugs and bladder cancer by reviewing reports from the FDA Adverse Event Reporting System ("AERS") between 2004 and 2009. The association was analyzed by the case/noncase methodology. There were 31 recorded reports of bladder cancer in patients using pioglitazone. Piccinni's results indicated that the reporting odds ratio for pioglitazone was indicative of a "definite risk." *Assessing the Association of Pioglitazone Use and Bladder Cancer Through Drug Adverse Event Reporting*, Piccinni, et al. Diabetes Care, 34:1369-1371 (June 2011), published ahead of print April 22, 2011.

59.     Despite its knowledge of this dangerous side effect that can result from Actos use, Defendants refused to warn patients, physicians and the medical community about the risk of bladder cancer.

60.     Actos was one of Defendants' top selling drugs. Upon information and belief, in 2011, the medication had global sales of over $4.8 billion and accounted for approximately 27% of Takeda's revenue. In 2008, Actos was the tenth best-selling medication in the United States.

61.     Consumers, including Plaintiff's members, who have used Actos for treatment of Type II diabetes, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with long term Actos therapy.

62.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs' insured and Plaintiffs' 333 members' physicians the true and significant risks associated with long-term Actos use.

63.     As a result of Defendants' actions, Plaintiff's members and Plaintiff's members' prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff's members had been exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of Defendant's acts, omissions, and misrepresentations.

64.     Plaintiff's members were prescribed and began taking Actos at the direction of a physician.  Plaintiff's members subsequently developed bladder cancer.

65.     As a direct result of being prescribed Actos, Plaintiff's insured has been permanently and severely injured, having suffered serious consequences from Actos use. Plaintiff's members require, and will in the future require, ongoing medical care and treatment.

66.     As a direct and proximate result of the use of Actos, Plaintiff's members suffered severe physical pain and suffering and have, and will sustain permanent injuries due to the development of bladder cancer. Plaintiff made payment for the injuries sustained by its members as a direct result of the wrongful conduct of the Defendants.

67.     Plaintiff's members would not have used Actos had Defendants properly disclosed the risks associated with its use.

68.      Upon information and belief, thousands of patients have alleged they suffered injury related to their Actos usage and Takeda has agreed to settle approximately 9,000 cases for $2.4 Billion dollars.

69.     The Indian Health Service ("IHS") is responsible for providing federal health services to American Indians and Alaska Natives.[1]  Indian people today still suffer from deplorable health compared to other Americans.  They are 600% more likely to die of tuberculosis, 510% more likely to die of alcoholism, 189% more likely to die of diabetes, and 40% more likely to die of pneumonia and influenza.[2]  This disparity often hits children the hardest: As compared to other Americans, they are 30% more likely to die as infants,[3] twice as likely to die before age 5, more than twice as likely to commit suicide, and three times as likely to die before reaching the age of 25.[4]

70.     These statistics are the result of a systematic failure in health care services for Indians.  Unlike Medicaid and Medicare, the IHS is not an entitlement program, and its funding does no keep pace with inflation.[5]  Funding levels are estimated to provide for only about 55% of the health-care needs of the 1.8 million people using IHS.[6]  Inadequate funding is exacerbated by discrimination, poverty, and structural deficits in health care systems.[7]

71.     Tribes today may enter into self-determination contracts and self-government compacts to administer IHS programs.  Tribes currently administer more than half of the funding for IHS programs.[8]

72.     The Indian Self-Determination and Education Assistance Act ("ISDEAA") is the law most responsible for changes in health care services to Indians in the modern era.  Titles I

---

[1] 25 U.S.C. § 1661
[2] Indian Health Services, Facts on Indian Health Disparities 1 (2006), available at info.ihs.gov/files/disparitiesfacts-Jan2006.pdf.
[3] Id.
[4] U.S. Comm'n on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country 34 (2003).
[5] President's Indian Programs Budget for FY 2004: Hearing Before the S. Comm. On Indian Affairs, 108th Cong. 21 (2003) (statement of Julia Davis-Wheeler, National Indian Health Board Chairperson).
[6] Indian Health Services, Facts on Indian Health Disparities 1 (2006), available at info.ihs.gov/files/disparitiesfacts-Jan2006.pdf.
[7] U.S. Comm'n on Civil Rights, Broken Promises: Evaluating the Native American Health Care System 31-37, 47 (Sept. 2004).
[8] Indian Health Serv., IHS Year 2011 profile, available at www.ihs.gov/PublicAffairs/IHSBrochure/Profile2011.asp

and II of the Act, enacted in 1975, allow tribes to enter into self-determination contracts with the federal government to take control of federal programs, including health care.  These contracts are popularly known as "638 contracts" after the original public law number.  Over the years Congress has sought to enhance the degree of tribal control of health care, first with Title III, which created self-governance demonstration program to increase flexibility in administration of tribal programs[9] then Title IV, which made self-governance permanent for the Department of the Interior,[10] and then Title V, which made self-governance permanent for the IHS.[11]  These laws, and others building on their approach, have resulted in a revolution in Indian health care services.  In 1970, only 1.5% of BIA programs for Indians and only 2.4% of IHS programs were administered by Indian tribes.[12]  Today, tribes administer more than half of these programs.[13]

73.     Under the ISDEAA, Indian tribes may enter into contracts with the federal government to take over administration of programs formerly administered by the federal government on their behalf.[14]

74.     If a tribe operates a program more cheaply than the federal government did, it can keep the savings and put them back into the program.[15]

75.     As tribes took over a greater role in their health care programs, their ability to recover funds from third party tortfeasors became of paramount necessity.  To that end, Congress enacted 25 U.S.C. § 1621e to place tribes in the same position as the federal government under the Federal Medical Care Recovery Act ("FMCRA").

---

[9] Pub. L. No. 100-472, Title II, § 209, 102 Stat. 2296 (1988)
[10] Pub. L. No. 103-413, § 204, 108 Stat. 4272 (1994).
[11] Pub. L. No. 106-260, § 501, 114 Stat. 713 (2000).
[12] President Richard M. Nixon, Special Message on Indian Affairs, H.R. Doc. No. 91-363, at 3 (1970).
[13] Indian Health Serv., U.S. Dep't of Interior, IHS Year 2014 Profile, available at http://www.ihs.gov/newsroom/factsheets/ihsyear2014profile/ Last visited July 17, 2014.

[14] 25 U.S.C. § 450f(a)(1)
[15] 25 U.S.C. § 450-1(a)(4)

76.     Under FMCRA, Indian tribes have the same recovery rights as the United States.

77.     Pursuant to 25 U.S.C. § 1621e(a), the Putative Class is entitled to the reasonable costs of  healthcare provided to Actos Claimants from a third-party tortfeasor, here, TAKEDA.

78.     Actos Claimants received health care services for their Actos related injuries at no cost from Indian tribes.

79.     TAKEDA is aware of the name, address, social security number, the injury, health care providers that treated and diagnosed the injury, the amount allocated for the claimed injury, and the scope of the release.  Further, TAKEDA has a Plaintiff Fact Sheet ("PFS") which required the identification of treating and diagnostic facilities.  In short, TAKEDA has the information to identify the injury of each Actos Claimant and the Putative Class Member that provided medical care to that individual.

80.     The Cherokee Nation and the members of the Putative Class will suffer irreparable harm unless the Court requires TAKEDA to disclose the names, identities, and Indian health care service providers for the Actos Claimants.

### *Concealment of Defendants' Conduct and Tolling of Statute of Limitations*

81.     The applicable statute of limitations regarding the claims of Plaintiff and the class has been tolled by Defendants' concealment of its unlawful, deceit, as alleged in detail throughout this Complaint.

82.     As evidenced by the allegations in this Complaint, Defendants have employed and continue to employ practices and techniques of secrecy in order to avoid detection of, and to conceal, their deceptive and conspiratorial behavior regarding the safety and efficacy of Actos as well as its risks associated with bladder cancer.

83.     Defendants successfully concealed from Plaintiff and the class facts sufficient to excite suspicion of claims against Defendants arising from its deception.

84.     Despite taking on the responsibility to reveal this information to the general public, Defendants have kept such information hidden.

85.     As such, Plaintiff and the class were not effectively alerted to the existence and scope of this industry-wide smokescreen and were not on notice of their potential claims until shortly prior to the filing of this Complaint.

86.     Plaintiff and the class could not have acquired such knowledge through the exercise of reasonable diligence.

87.     Through its public statements, marketing and advertising, Defendants' self-concealing scheme and affirmative conduct to perpetuate its scheme deprived Plaintiff and the class members of actual or presumptive knowledge of facts sufficient to put them on notice as to their potential claims.

### *Injury to Plaintiff and the Class*

88.      Defendants' deceptive and misleading marketing scheme increased the number of prescriptions of Actos written and filled. Because Defendants withheld material information about the true safety and efficacy of Actos, the prescribing physicians did not have the knowledge necessary to make informed decisions regarding Actos prescriptions. Plaintiff and the class, unaware of Defendants' scheme, paid for these prescriptions and the consequent medical care resulting from the use of Actos. Although more effective, safer, and less expensive alternatives are available, Defendants/ promotion and marketing of Actos' safety and effectiveness has been highly successful, resulting in Defendants receiving billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled.

89.     Plaintiff and similarly-situated class members bear the ultimate responsibility of paying for the Actos prescriptions and resultant medical care.

90.     Pharmacy Benefit Managers ("PBM") and P&T Committees prepare a "formulary," which is a list of the drugs that are approved for coverage by their third-party payor clients, such as Plaintiff and the class members. In order for a drug to be listed on the formulary, it must be assessed by the PBM for clinical safety, efficacy, and cost effectiveness. Further, where a PBM finds that a drug has an advantage over competing drugs, that drug is given a preferred status on its formulary.

91.     The level of preference on the formulary corresponds with the amount that a plan participant must contribute as a co-payment when purchasing a drug the higher the preference, the lower the co-payment, the more likely that the drug will be purchased by a prescription plan's beneficiary in lieu of a cheaper or more cost effective alternative, and vice versa. As such, the higher a drug's preference on the formulary, the more likely it is for a doctor to prescribe that drug. This system is well known to pharmaceutical manufacturers, including Defendants.

92.     Due to the large number of drugs purchased through third-party payors, it is vital to a drug manufacturer's economic interests to have its product listed on as many formularies as possible.

93.     By directly and falsely promoting Actos as safe and effective for Type II diabetes and training its sales forces and representatives to avoid alerting the FDA to its activities and to dismiss any safety concerns raised by physicians, Defendants influenced PBMs to place Actos on their formularies and higher in preference on those formularies.

94.     Defendants falsely promoted Actos as safe and effective directly to PBMs in order to get Actos placed on, or placed more favorably than its competitor drugs on the PBM formularies.

95.     Patients, physicians, PBMs, P&T committee members, and third-party payors relied on the Defendants' misrepresentations of Actos's safety. Physicians relied on the Defendants' misrepresentations of Actos's safety in prescribing the drug for their patients. Patients relied on the Defendant's misrepresentations of Actos's safety in purchasing the drug. PBMs and pharmacy and therapeutic committees relied on Defendants' misrepresentations regarding Actos's safety when approving and/or placing Actos on formularies. Third-party payors relied on the Defendants' misrepresentations regarding Actos's safety in reimbursing and/or paying for prescriptions of Actos for their members and for their members' resultant medical care caused by the Actos use.

96.     Therefore, Defendants' failure to adequately inform consumers, third-party payors and those in the medical community that the use of Actos dangerously increases the risk of bladder cancer, and its false and misleading promotion of Actos's efficacy over competing less expensive antidiabetic drugs, caused patients and third-party payors to pay for Actos, which is neither safer nor more effective than other less expensive antidiabetic drugs.  The Actos drug products further caused personal injuries; care for which Plaintiff and the class had to also pay.

97.     The reduction in Actos prescriptions after Plaintiff and the class learned the truth about Defendants' misrepresentations illustrates the causal link between Defendants' misrepresentations and Plaintiff's injuries.

98.     But for Defendants' actions, Plaintiff would not have paid for Actos (and suffer the resultant injuries) but would instead have paid for safer, equally efficacious drugs like metformin and/or sulfonyureas.

## CLASS ALLEGATIONS

99.     Plaintiff brings this suit as a class action pursuant to Rule 23(a), (b) and (c) of the Federal Rules of Civil Procedure, on behalf of itself and all other federally recognized Indian tribes similarly situated, who are members of the following putative class:

> All federally recognized Indian tribes, and their respective health care providers, which since 1999 have paid for Actos and/or provided medical care for injuries to tribal members that claimed Actos caused them injury and who have sued, entered into tolling agreements, or settled with TAKEDA or Lilly, with respect to those claims for Actos-related injuries and the cost of each prescription written. Attached hereto as Exhibit "A."

### A.     Numerosity of the Class.

102.    A list of the Putative Class is attached hereto as Exhibit "A," compromising all federally recognized Indian tribes that provide health care services to their members.  The Putative Class is so numerous and geographically dispersed throughout the United States that joinder of all members is impracticable.  The disposition of claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.  The Putative Class members are identifiable and Settling Actos Claimants can be identified through records maintained by TAKEDA.

### B.     Predominance of Common Questions of Fact and Law.

103.    Plaintiff satisfies the requirements of Rule 22(b)(3) as there is a well-defined community of interest in that the questions of law and fact common to the Putative Class which predominate over questions affecting only individual Class Members.  Among the questions of law and fact common to all Class Members include:

i.      Whether Defendants are required to address the Putative Class' reimbursement rights under FMCRA;

ii.     Whether the Putative Class subrogation interests are required to be addressed in Defendants' Master Settlement Agreements.

iii.    Whether Defendants' conduct regarding reimbursement to Indian tribes is a uniform course of conduct that has affected all Putative Class members in the same manner;

iv.     What are the reasonable charges of medical care for each qualifying Actos related injury;

v.      Whether Defendants are obligated to reimburse the Putative Class for the reasonable cost of tribal members' prescription and medical costs;

vi.     Whether Defendants should be enjoined from distribution of Settling Actos Claimants proceeds;

vii.    Whether the evidence regarding Defendants' conduct is common to all Indian tribes and Plaintiff's claim is typical of the Putative Class.

viii.   The amount of attorneys' fee, prejudgment interest, and costs of suit to which the Putative Class is entitled.

These claims can be productively litigated at one time by:

1.      Identifying the Settling Actos Claimants that received care from a Putative Class Member;

2.      Identifying the Settling Actos Claimants' injury;

3.      Determining the reasonable cost of the medical care for that injury;

**4.**      Reimbursing the Putative Class Member the reasonable cost of care for the Settling Actos Claimant's injury.

### C.      Typicality.

104.     Plaintiff's claims are typical of the claims of the Putative Class because Plaintiff and the Class provided treatment to Settling Actos Claimants and have the identical rights under FMCRA as all other federally recognized Indian tribes.  As such, Plaintiff has no interests to or in conflict with those of the Putative Class Members and therefore should be adequate as a representative of the Class.

### D.      Adequacy of Representation.

105.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because its interests do not conflict with the interests of the Class Members it seeks to represent.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained counsel competent and experienced in complex litigation, class action litigation, and Indian law.

### E.      Superiority.

106.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class Members is impracticable.  Even if every Class Member could afford individual litigation, the court system could not.  It would be unduly burdensome to the court in which individual litigation of hundreds of cases would proceed.   Individual litigation presents a potential for inconsistent or contradictory judgments, and the prospect of a race to the courthouse and inequitable allocation of recovery among those with equally meritorious claims.  Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues

common to all claims related to Actos.  By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

107.    The various claims asserted in this action are also certifiable under the provisions of Rules 23(b)(1) and/or 23(b)(2) of the Federal Rules of Civil Procedure because:

a.    The prosecution of separate actions by hundreds of Indian tribes would create a risk of inconsistent or varying adjudication with respect to individual Class Members, thus establishing incompatible standards of conduct for TAKEDA;

b.    The prosecution of separate actions by individual Indian tribes would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Indian tribes who are not a party to such adjudications and would substantially impair or impede the ability of such non-party Class Members to protect their interests; and

c.    Defendants have acted or refused to act on grounds generally applicable to the entire Class, thereby making appropriate final relief with respect to the Class as a whole appropriate.

## CLAIMS FOR RELIEF

## CLAIM I.

## FEDERAL MEDICAL CARE RECOVERY ACT ("FMCRA")

108.    Pursuant to 25 U.S.C. § 1621(e), the Class is entitled to the reasonable costs of medical care provided by the Putative Class to Settling Actos Claimants from a third-party tortfeasors, TAKEDA and Lilly.

109.    The Putative Class is entitled to a finding as to what constitutes reasonable costs for each qualifying Actos related injury.

110.    Settling Actos Claimants are tribal members that received health care services for Actos related injuries.

111.    Defendants have not reimbursed, or set aside money to reimburse, Plaintiff and other Indian tribes from monies paid to Settling Actos Claimants or otherwise.

112.    If the Class prevails on its claim for reimbursement, it is also entitled to costs and attorney fees pursuant to 25 U.S.C. §1621(g).

## CLAIM II.

### EQUITABLE RELIEF, MANDAMUS, AND INJUNCTION

113.    Plaintiffs repeat, reiterate and reallege each and every factual allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

114.    Defendants should be ordered to disclose to the Putative Class the identities of every Settling Actos Claimant who has settled with them, who sued them, or who has entered into a tolling agreement with them, the injury claimed by such Claimant, and the Indian tribe that provided medical treatment or diagnosis to such Claimant, so that the Class may recover the reimbursement under FMCRA that they are entitled to receive.

115.    Settling Actos Claimants and their attorneys, whose identities are presently unknown to Plaintiff but known to Defendants, have not reimbursed Plaintiff or other federally recognized Indian tribes.

116.    The Putative Class seeks injunctive relief pursuant to 25 U.S.C. §1621(e)(3)(a) to enjoin further conduct by Defendants regarding payment to Actos Claimants.

## CLAIM III:

## NEGLIGENCE

117.    Plaintiffs repeat, reiterate and reallege each and every factual allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

118.    This count seeks recoveries via the enforcement powers of the Cherokee Nation as provided by tribal law of the Cherokee Nation and other Indian tribes similarly situated. This is not a claim for monetary damages for individuals, or classes or groups of individuals, who suffered personal injuries as a result of the purchase or use of Actos.

119.    Defendants had a duty to exercise the care of an expert in all aspects of the formulation, manufacture, compounding, testing, inspection, packaging, labeling, distribution, marketing, and sale of Actos to ensure the safety of Actos and to ensure that the consuming public, including the Plaintiff's members and their physicians and agents, obtained accurate information and instructions for the use of Actos.

120.    Defendants owed a duty toward foreseeable users of Actos drug products to exercise reasonable care to ensure that Actos drugs were reasonably safe for ordinary and intended uses, and specifically, *inter alia*, to ensure through adequate testing, labeling, and otherwise, that physicians who would be likely to prescribe the products for their patients' use were adequately informed as to the potential effects of using the products in ordinary and foreseeable ways, in particular the risks of increased bladder cancer.

121.    Defendants failed to exercise reasonable care in testing Actos for side effects in ordinary and foreseeable users; and failed to disseminate to physicians accurate and truthful

information concerning the effects of Actos; thus, physicians were not able to make informed choices concerning the use of Actos drug products.

122.    Defendants failed to exercise ordinary care in the manufacture, sale, testing, marketing, quality, assurance, quality control and/or distribution of Actos into the stream of commerce in that Defendants knew of should have know that Actos drug products created a foreseeable high risk of unreasonable, dangerous side effects and health hazards.

123.    The dangerous propensities of Actos drug products as referenced above, were known or scientifically knowable, through appropriate research and testing, to the Defendants at the time it distributed, supplied, or sold the products, and not known to ordinary physicians who would be expected to prescribe Actos for the Plaintiff's members and other patients, similarly situated.

124.    The information Defendants disseminated to physicians concerning Actos drug products was, in fact, inaccurate, misleading, and otherwise inadequate, as described above.

125.    As a proximate result, the Plaintiff's members suffered grievous bodily injuries and consequent economic and other losses from ingesting Actos.

126.    The Defendants were negligent, and breached their duties of reasonable care to the Plaintiff's members with respect to Actos drug products in one or more of the following respects:

(a) Despite knowledge of hazards and knowledge that the product was frequently prescribed for the use, Defendants failed to accompany the product with adequate warnings and instructions regarding the adverse and long lasting side effects associated with the use of Actos;

(b) Defendants failed to conduct adequate testing;

(c) Despite knowledge of hazards, Defendants failed to conduct adequate post-marketing surveillance to determine the safety of the product;

(d) Despite knowledge of hazards, Defendants failed to adequately warn Plaintiff's members physicians or the Plaintiff's members that the use of Actos drug products could result in severe side effects as described above;

(e) Despite the fact that the Defendants knew or should have known that their Actos drug products caused unreasonably dangerous side effects, Defendants failed to adequately disclose the known or knowable risks associated with Actos as set forth above; Defendants willfully and deliberately failed to adequately disclose these risks, and in doing so, acted with a conscious disregard of the Plaintiff's members' safety and/or welfare;

(f) Defendants failed to design, develop, implement, administer, supervise and monitor its clinical trials for Actos; and

(g) Defendants, in its promotion of Actos, were overly aggressive and deceitful, and promoted Actos in a fraudulent manner, despite evidence known to Defendants that Actos was dangerous.

127.    As a direct and proximate result of the wrongful acts of the Defendants, the Plaintiff's members developed severe side effects as described herein, suffered irreparable bodily injury, and incurred and will continue to incur expenses for medical treatment, the cost of which was and may continue to be paid for by Plaintiff.

128.    The negligence, carelessness, and the willful and wanton misconduct of the Defendants was a proximate cause of Plaintiffs' insured's harms and injuries that Plaintiff's members suffered and will continue to suffer.

129.    In the alternative, Defendants' acts of omissions and concealment of material facts of the design and manufacturing defects were made with the understanding that patients and physicians would rely upon such statements when choosing Actos drug products.

130.    Furthermore, the economic damages and physical harm caused by Defendants' conduct would not have occurred had Defendants exercised the high degree of care imposed upon it.

131.    Plaintiffs demand compensations for all present and future damages incurred plus interest and costs.

## CLAIM IV:

## BREACH OF IMPLIED WARRANTIES

132.    Plaintiffs repeat, reiterate and reallege each and every factual allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

133.    This count seeks recoveries via the enforcement powers of the Cherokee Nation as provided by tribal law of the Cherokee Nation and other Indian tribes similarly situated. This is not a claim for monetary damages for individuals, or classes or groups of individuals, who suffered personal injuries as a result of the purchase or use of Actos.

134.    The defendants knew that most physicians who prescribed Actos drug products were not aware of the serious side effects as described herein associated with the use of Actos.

135.    The Defendants also knew that the risks of said side effects were much greater than most physicians realized. By failing to give adequate warnings about these side effects and the risk of the use that is associated with those side effects, the Defendants breached implied warranties of merchantability and fitness for the ordinary use of Actos.

136.   At all times mentioned in this Complaint, the Defendants manufactured, compounded, packaged, distributed, recommended, merchandised, advertised, promoted, supplied and sold Actos drug products and prior to the time Actos was used by Plaintiff's members, the Defendants impliedly warranted to Plaintiff's members and their physicians that Actos were of merchantable quality and safe and fit for the use for which Actos were intended.

137.   Plaintiff's members relied on the skill and judgment of the Defendants in using Actos drug products.

138.   Actos drug products were not safe and were unfit for their intended use, nor were Actos of merchantable quality, as warranted by the Defendants, in that Actos had very dangerous propensities when put to intended use and would cause severe injury to the user.

139.   Actos drug products were not properly prepared nor accompanied by adequate warnings of Actos dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution. As a result, Actos drug products proximately caused Plaintiff's members to sustain damages and injuries that Plaintiff has to compensate as alleged in this Complaint.

140.   As a direct and proximate result of the wrongful acts of the Defendants, the Plaintiff's members developed severe side effects as described herein, suffered irreparable bodily injury, and incurred and will continue to incur expenses for medical treatment, the cost of which was and will continue to be paid for by Plaintiff.

141.   Plaintiff demands compensation for all present and future damages caused by Defendants' misconduct plus interest and costs.

## PRAYER FOR RELIEF

Wherefore, the Cherokee Nation and the absent members of the Putative Class pray for the following relief:

1.   A determination that Defendants must address the Plaintiff's and the Putative Class' subrogation interests under FMCRA;

2.   Damages against Defendants for the reasonable cost of prescriptions and health care services made by the Plaintiff and the Putative Class, for Actos-related injuries incurred Actos Claimants, plus interest and attorney's fee;

3.   An Order requiring Defendants to identify to Plaintiff and the Putative Class the identities of Settling Actos Claimants that received medical care for Actos related injuries from Plaintiff or a Putative Class member;

4.   An injunction to prevent Defendants from making payments to Actos Claimants that received health care from a Putative Class member for Actos related injuries;

5. For prejudgment interest, attorney's fee, and for all other relief this Court deems just and equitable.

Dated:  April 30, 2015                  By: /s/ *Curtis "Muskrat" Bruehl*
                                        Curtis "Muskrat" Bruehl (OK Bar No. 19418)
                                        **THE BRUEHL LAW FIRM**
                                        14005 N. Eastern Ave.
                                        Edmond, OK 73013
                                        Tel: (405) 509-6300;
                                        Fax:  (405) 509-6268
                                        curtbrue@gmail.com

                                        Tracy D. Rezvani (D.C. Bar No. 464293)
                                        **REZVANI VOLIN** P.C.
                                        1050 Connecticut Ave, N.W., 10th Floor
                                        Washington, D.C. 20036
                                        Tel: (202) 350-4270 x 101
                                        Fax:  (202) 351-0544
                                        trezvani@rezvanivolin.com

                                        ATTORNEYS FOR PLAINTIFFS